In re Estate of Louis F. Nonnast, Incompetent.
In re Estate of Louis F. Nonnast, Deceased.
Leonore G. Nonnast, Guardian of Valerie L. Nonnast
et al., Appellants, v. The Northern Trust Company,
as Conservator of the Estate of Louis F. Nonnast,
Incompetent, and as Executor of the Estate of
Louis F. Nonnast, Deceased, Appellee.

Gen. No. 40,426.

538

Opinion filed June 21, 1939.   Rehearing denied July 3, 1939.

STEARNS & JONES, of Chicago, for appellants; MAL-COLM McKERCHAR and LLOYD M. McBRIDE, both of Chicago, and ROBERT V. JONES, of counsel.

VERNON R. LOUCKS, of Chicago, for appellee.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from a final order entered upon the final report and accounting filed in the probate court in the estate of Louis F. Nonnast, incompetent, and the estate of Louis F. Nonnast, deceased, which cause was afterwards heard in the circuit court on appeal from the probate court. The circuit court in effect upheld the action of the probate court.

The plaintiffs, Louis F. Nonnast and Valerie L. Nonnast, individually, and Leonore G. Nonnast, as guardian of Valerie L. Nonnast, a minor (hereinafter referred to collectively as the "objectors"), filed objections in the probate court of Cook county to the first and final account and report of the Northern Trust Company, as conservator of the estate of Louis F. Nonnast, incompetent, and also filed objections to the first current account and report and the amended second and final account and report of the Northern Trust Company, as executor of the estate of Louis F. Nonnast, deceased. With one minor exception, the probate court overruled all the objections filed in both estates, and from those orders the objectors appealed to the circuit court of Cook county. The two appeals were consolidated in the circuit court where trial was had by the court without a jury. The objectors bring this appeal from the circuit court order.

No point is raised as to the pleadings.

The objectors' theory of the case is that the Northern Trust Company, both as conservator and as executor, violated the law governing the conduct and powers of conservators and executors, made illegal and im-

proper disbursements, and failed and neglected to collect claims due the estate, with the result that the estate has been completely wiped out. Consequently, the objectors maintain that the Northern Trust Company, as executor, should be surcharged in its amended second and final account with an amount equal to the losses sustained by the estate as a result of the acts complained of by the objectors. The objectors also assert that in view of its misconduct, the Northern Trust Company should be denied credit for all fees paid, and should be charged with interest and with the costs of this litigation.

The Northern Trust Company's theory of the case is that all its disbursements and acts, both as conservator and executor, were legal and proper, and that though losses were suffered in both the estate of Louis F. Nonnast, incompetent, and in the estate of Louis F. Nonnast, deceased, such losses could not be attributed to any violation by the Northern Trust Company of the laws governing the conduct of conservators and executors.

There does not seem to be much controversy as to the facts, and they are in substance as follows:

A few days prior to March 1, 1930, Louis F. Nonnast, then 82 years old, suffered a paralytic stroke caused by a cerebral hemorrhage. On March 1, 1930, his son, Emory Nonnast, signed and filed in the probate court of Cook county a petition to have Louis F. Nonnast adjudged incompetent and the Northern Trust Company appointed conservator. This petition stated that Nonnast was "paralyzed, unable to speak, and intermittently in a state of coma."

On March 6, 1930, a jury in the probate court of Cook county brought in a verdict that Louis F. Nonnast was a "distracted person," and on the same day letters of conservatorship were issued to the Northern Trust Company. The afternoon of the day of the issuing of the letters of conservatorship, Robert E. Agee,

assistant secretary of the Northern Trust Company, and A. J. Hennings, attorney for the Northern Trust Company as conservator, called on Nonnast in his bedroom. Also present was Emory Nonnast. Louis F. Nonnast was still in bed, still paralyzed and still under the constant attendance of a nurse, which condition obtained until his death on May 17, 1930. The conversation was carried on by questions put to Nonnast which he apparently answered by nods of the head and indicating ''yes'' and ''no,'' since he could not talk. Subsequently one or two further calls were made on Nonnast by representatives of the Northern Trust Company. The purpose of these calls it was claimed was to learn the details of the incompetent's estate, which had been entrusted to the care of the conservator, and also, to ascertain the wishes of the incompetent with respect thereto.

One of the principal interests of Louis F. Nonnast had been Louis F. Nonnast Sons, Inc. (hereinafter referred to as the ''Nonnast company''), or Louis F. Nonnast Co., Inc., an Illinois corporation engaged in the manufacture and sale of furniture, particularly tables, in which corporation Nonnast, the incompetent, owned 2,850 shares out of 3,000 shares of stock issued and outstanding. At the time the conservator was appointed this company was hopelessly insolvent. It had lost money consistently for many years and as of March 15, 1930, it had an accrued deficit of $265,914.40.

The conservator decided that an audit of this company should be made and also of the affairs of its incompetent ward. For that purpose Thulin & Co. was employed. Thulin prepared an audit of the estate and of the Nonnast company as of March 15, 1930, for which audit the conservator paid $975. This audit showed a net estate belonging to Nonnast of $358,512.71, consisting of real estate in the net amount of $177,505 and personal property in the net amount of $181,007.71. This value for the estate of Nonnast in-

cluded no value whatever for the stock of the Nonnast company.

On March 15, 1930, the Nonnast company was indebted to Nonnast in a total amount of $282,948.81. This indebtedness had resulted from the efforts of Nonnast to keep the Nonnast company going; he had advanced money from time to time as the affairs of the company had demanded it. Part of the indebtedness was represented by notes, the earliest one being dated January 30, 1926, and part by open account. In the audit this indebtedness was estimated at 25 per cent of its face value.

The audit showed that the Nonnast company, as of March 15, 1930, had a condensed balance sheet as per its books, as follows:

"ASSETS:

| | |
|---|---|
| Cash | $69.80 |
| Notes & Accounts Receivable (less reserves of $7,129.57) | $86,692.02 |
| Accounts Receivable (officers & employees) | 69,379.29 |
| Suspense Accounts & Prepaid Insurance | 9,886.98 |
| Inventory | 122,872.77 |
| Machinery & Equipment | 15,030.63 |
| Good will | 127,425.06 |
| | $431,356.55 |

LIABILITIES:

| | | |
|---|---|---|
| Bank Overdraft | | $1,906.13 |
| Notes & Accounts Payable | | 395,364.82 |
| Capital Stock | $300,000.00 | |
| Deficit | 265,914.40 | 34,085.60 |
| | | $431,356.55" |

The audit indicated that the assets of the company were considerably overstated on its books and that the

company's condition was even worse than as indicated by its balance sheet. Of accounts receivable carried on the books as assets, in excess of $37,000 was owed by firms which had gone into bankruptcy, and only $41,535.56 of the accounts receivable was listed by the audit as good. The receivables from officers and employees were noted as very doubtful. The inventory consisted of raw materials in the amount of $25,112.44, which the audit noted as of very doubtful value, work in process of $66,308.17, and finished goods in the amount of $30,409.82. The audit reported the loss of the company in 1929 had been $132,379.64, and that the company had lost $36,310.20 in the first two and a half months of 1930.

About this time the Northern Trust Company determined to liquidate certain securities belonging to its ward and to advance the proceeds to the Nonnast company in an effort to keep it going. Accordingly, on March 13, 1930, the Northern Trust Company, without notice to anyone filed its petition in the probate court, representing to the court that the Nonnast company had an inventory of $235,000, "consisting almost entirely of material in process," and requesting authority "to loan the Louis F. Nonnast & Sons Company not exceeding $17,500.00."

An order granting the relief prayed in this action was entered on the same date. Subsequently the Northern Trust Company sold securities in a substantial amount and with the proceeds lent $20,000 to the Nonnast company. Of this loan $15,200 was lent prior to the death of Nonnast on May 17, 1930 and notes representing that amount were taken from the Nonnast company, and the remaining $4,800 was lent subsequent to the death of Louis F. Nonnast, and notes taken therefor. The last note is dated June 24, 1930.

The conservator Northern Trust Company states that it was influenced in making payment by the advice given it by the distracted person. We do not see how

this could be a justification as the wishes of Nonnast were wholly immaterial. The only reason for the conservator having been appointed by the court, as provided by statute, was that Nonnast had become a distracted and incompetent person and was unable to transact any business. We do not think this constitutes a sufficient reason for the court to allow the claim nor was it even the semblance of an excuse and the court erred in admitting evidence as to what the ward said to the conservator.

As was said in *People's Bank v. Wood,* 207 Ill. App. 602: ''The duty of the conservator to collect the judgment is fixed by law, and the desires of the ward cannot be considered either by the conservator or the court.'' As to the actions of the Northern Trust Company, in its capacity as executor, proof of Nonnast's wishes equally constituted no defense.

In the case of *Waterman v. Alden,* 144 Ill. 90, the defendants, who were both executors and trustees under the will of Waterman's estate, were seeking to avoid liability for failure to collect a particular judgment on the ground that Waterman's business connections during his lifetime were such that he would have preferred not to have had the judgment collected. The Supreme Court in its opinion stated: ''While Special Master Loomis, by his report, excuses the conduct of the trustees, he does not do so on the ground that they were not negligent, but rather upon the theory, that, from the relations existing between the testator and the Marsh's, it is fair to presume that he, if living, would have used no more care and diligence in enforcing those claims than did appellees. It need scarcely be suggested that no such test can properly be applied to the conduct of trustees. There may be abundant reason for believing that Mr. Waterman, though a careful business man, would much rather have lost the indebtedness than to have pressed the collection of it, but that furnishes no excuse for these trustees to neglect

or fail to use all reasonable diligence in the matter. Mr. Waterman might do with his own as he pleased, but the duties of these appellees are fixed by the law, and if they have violated those duties they are personally liable.''

We are constrained to hold that the wishes or desires of Louis F. Nonnast or conversations had with him had no place in the evidence.

Louis F. Nonnast died on May 17, 1930. In the latter part of May, 1930, shortly after the death of its ward, the Northern Trust Company called a meeting at its place of business for the purpose of considering what should be done about the Nonnast company. Present at the meeting were Messrs. H. H. Rockwell, F. S. Booth and T. S. Estrem, officers of the Northern Trust Company, A. J. Hennings, attorney for the conservator, Emory Nonnast, W. H. Theel, secretary of the Nonnast company, and a Mr. Anderson, bookkeeper for the Nonnast company. At this meeting it was decided, so it is now stated, to liquidate the Nonnast company. At about the same time two of the directors of the Nonnast company resigned and T. E. Estrem and A. J. Hennings were elected directors of the company. From this time forward the Northern Trust Company was in complete control of the Nonnast company and directed all its affairs.

In spite of its statement that it decided in May, 1930, to liquidate the Nonnast company, the Northern Trust Company instructed Thulin & Co. to plan and install a cost accounting system for the Nonnast company and also to furnish the company with a general office manager. For this purpose Thulin & Co. furnished the services of one D. T. Hill, who worked on the installation of a cost accounting system for the Nonnast company and acted as general office manager of the company. He began his duties June 1, 1930, and his salary for the month of June was not paid by the Nonnast company, but by the Northern Trust Company as con-

servator. His salary for the months of July to November, inclusive, was paid on September 9, 1930 (prior to the appointment of the executor) by the Northern Trust Company as executor. Thulin & Co. was paid $325 per month for its services. Beginning the first of December, 1930, Hill's salary was paid by the Nonnast company. Although the Northern Trust Company as conservator and executor paid $325 per month for Hill's salary, Hill only received $200 per month of this amount until he started working directly for the Nonnast company. Some time during the late summer or fall of 1930, Hill was elected president of the company and became general manager.

During the summer of 1930, the Northern Trust Company which was then in control of the Nonnast company, caused said company to fill a very substantial order for radio cabinets with the Silver-Marshall Co. This order required a substantial amount of capital to carry it through, and further cash being needed the trust department of the Northern Trust Company requested its own banking department (being the same corporation) to advance the sum of $13,000 on the security of trade acceptances of the Silver-Marshall Co. The Northern Trust Company thereupon advanced an additional $13,000 without security. With this money the order was completed. The trade acceptances were duly paid by the Silver-Marshall Co., thereby liquidating one-half of the loan; the Nonnast company later paid $7,500 thereon; and the Northern Trust Company later caused the estate of Nonnast to pay off the balance of the loan.

When the Northern Trust Company loaned the money and charged it against the estate, it put itself in an adverse position to its ward in having to decide between the interests of its ward and that of itself. Said company should not have placed itself in such a position. Its duty was to protect the interests of the ward rather than its own.

On July 2, 1930, the Northern Trust Company, representing itself as still being the conservator of Nonnast, incompetent, filed its petition in the probate court, without notice to anyone, representing that Nonnast was liable on a guaranty of certain trade acceptances of the Grand Rapids Furniture Co. in the total amount of $10,394.38, which trade acceptances had been discounted with the Security Bank of Chicago, and requesting authority to sell certain securities of the estate and to pay the amount due, including interest, on account of such trade acceptances, the Grand Rapids Furniture Co. not having paid the same and being in bankruptcy. On the same day an order was entered granting the relief prayed in the petition. Accordingly on July 15, 1930, the Northern Trust Company paid to the Security Bank $10,539.89, being money that belonged to the estate of Nonnast. There were, in fact, no trade acceptances or other obligations of the Grand Rapids Furniture Co. discounted at the Security Bank. There were, however, three notes of the Nonnast company totaling the above amount, which three notes had been given by the Nonnast company to the Security Bank at different times during February, 1930, for moneys lent to the company. The Security Bank claimed that Nonnast had guaranteed the payment of the notes and requested the Northern Trust Company as conservator to pay the amount due, the Nonnast company not having paid the notes when they came due in May, 1930. No guarantee was produced at the trial and no claim was filed by the Security Bank against the estate, as required by statute.

It further appears from the evidence that the Northern Trust Company adopted a policy of paying off all creditors of the Nonnast company except the claim of the Estate of Louis F. Nonnast, and this policy was consistently maintained, throughout the conservatorship and the executorship. Two reasons are advanced by the Northern Trust Company for the

adoption of this policy: *First,* subsequent to Nonnast's adjudgment as a distracted person, he advised his conservator that he wanted all debts of the Nonnast company paid; and *Second,* Nonnast or W. H. Theel, secretary of the Nonnast company, had told all creditors of the Nonnast company that Nonnast would see that all bills of the Nonnast company were paid, and the estate of Nonnast thereby became liable for the payment thereof. No claim, however, by any creditor of the Nonnast company was ever filed either against the estate of Nonnast, incompetent, or against the estate of Nonnast, deceased, except one claim by the First Wisconsin National Bank, based upon notes which Nonnast had personally signed as comaker. No objection is made to the payment of these notes to the Wisconsin Bank.

No protection of the assets of the estates was shown or defense offered to the allowance of said claims. This neglect by the Northern Trust Company whose duty it was to protect the estates committed to its charge cannot be countenanced in any way.

On August 12, 1930, the Northern Trust Company, as conservator, filed with the probate court a suggestion that its ward had died testate on May 17, 1930. On October 8, 1930, the will of Nonnast was admitted to probate, and letters testamentary were issued to the Northern Trust Company, which was named executor under the will. The will, after making certain bequests, left the residue of the estate to the Northern Trust Company as trustee for the benefit of certain persons, including the objectors to these reports and accounts.

The Northern Trust Company as conservator continued to deal with the estate of its deceased ward until September 15, 1930. On that day, according to its account as conservator, it turned over to itself as executor all the assets of the estate of its ward remaining in its hands. On October 21, 1930, the Northern Trust Company as conservator filed its first and final

account in the probate court, without notice to anyone except to itself as executor, and the account and report were approved. This account and report covers the administration of the Northern Trust Company, as conservator, from March 6, 1930, to the close of business September 15, 1930. In addition to the specific transactions mentioned above, the conservator, during the period from March 6, 1930 to September 15, 1930, collected income due the estate of its ward, and made sundry disbursements. These disbursements were made subsequent to the death of its ward as well as prior thereto and consisted not only in the payment of expenses incurred by the conservator but in the payment of many debts of the decedent, without claims being filed and without a court hearing on such claims individually.

Although the Northern Trust Company as conservator reported that it turned over all the assets in its hands as conservator to itself as executor at the close of business on September 15, 1930, yet the account of the Northern Trust Company as executor indicates the receipt of cash in the amount of $8,200 from the conservator on July 28, 1930. The report of the executor is apparently correct in this regard, inasmuch as subsequent to July 28, 1930, and prior to September 15, 1930, the Northern Trust Company as executor made sundry cash disbursements.

On November 26, 1930, the Northern Trust Company as executor filed its petition in the probate court requesting authority to sell additional securities and lend an additional $6,500 to the Nonnast company. This petition was filed without notice to anyone, and on the same day on which it was filed an order was entered granting the relief prayed. This amount was subsequently loaned by the executor, but no notes of the Nonnast company were obtained.

Thereafter, the manufacturing and selling activities of the Nonnast company were gradually reduced during the fall of 1930 and by the end of that year had

entirely ceased. Throughout this period the debts of the Nonnast company were being paid off, except the indebtedness to the estate of Nonnast, so that on December 31, 1930, the only indebtedness of the company (other than to the estate of Nonnast) remaining unpaid was a balance of $12,000 owing on the indebtedness to the Northern Trust Company, and trade accounts and notes payable in the approximate amount of $15,000. There was also a liability to the Commonwealth Edison Company on a contract for the purchase of electrical equipment.

Subsequent to December 31, 1930, the Nonnast company collected amounts due to it on trade receivables and paid off all trade accounts and notes payable, and paid the sum of $6,500 on the obligation to the Northern Trust Company, leaving a balance of $5,500 unpaid. This balance of $5,500 remained unpaid until June, 1932, when the trust department of the Northern Trust Company being pressed by the banking department of the same corporation, executor, for payment of the balance, and the estate of Nonnast having about $6,000 in cash on hand, the Northern Trust Company, on June 4, 1932, took $5,500 from the estate and charged the estate that amount on account of fees alleged to be due to the Northern Trust Company for services, and turned the $5,500 over to the so-called banking department, and the so-called banking department turned over to the Northern Trust Company, the executor, the note of the Nonnast company, where it still remains.

When we refer to the trust department and the banking department, we do not mean to infer that there were two separate corporations as they are one and the same and all actions referred to by either department are those of the Northern Trust Company, a corporation, the conservator and executor herein. During the course of the operation of the business of the Nonnast company by the Northern Trust Company, funds of the estate of Nonnast were used by both

executor and conservator to pay sundry bills of the Nonnast company.

In further explanation of the written contract between the Nonnast company and the Commonwealth Edison Company which was entered into July 23, 1929, said contract was signed on behalf of the Nonnast company by W. H. Theel. It provided for the installation of sundry electrical equipment in the building owned by Louis F. Nonnast on Halsted street, Chicago, which building was used by the Nonnast company as a factory. The price for the electrical equipment was $28,833.34, payable in monthly instalments. Title remained in the seller until the contract price was paid in full. The Northern Trust Company as executor adopted in February, 1931, a policy of paying the monthly instalments due under this contract with funds belonging to the estate of Nonnast. A total of $2,988.15 on account of instalments due under the contract was paid at various times by the executor. After paying the sum of money, for some reason, not apparent, the contract was abandoned by the executor and the equipment thereafter reclaimed by the Commonwealth Edison Company. The Northern Trust Company gives as a reason or excuse for paying this bill that otherwise, damage might result to the estate. This is not a sufficient reason to justify or legalize their acts.

The Northern Trust Company filed its inventory as executor on March 5, 1931. In this inventory all notes of the Nonnast company were listed as "desperate," as was also the stock therein.

On August 4, 1931, the executor presented to the court a petition asking the court to approve the execution of a proposed contract by the executor with T. J. Ryan, J. S. Hayes and R. T. Doyle. On the day of the petition's presentation an order was entered giving the executor leave to enter into the proposed contract. The petition and order were without notice to anyone. Under the contract, which was thereafter duly executed,

*The Northern Trust Company* as executor purported to sell to the second parties the machinery and equipment of Louis F. Nonnast Sons, Inc., and also the entire inventory of furniture, parts in process, raw materials, and supplies of Louis F. Nonnast Sons, Inc., and by the same contract *The Northern Trust Company as executor* purported to lease to the purchasers for five years the land and building on Halsted street which had been occupied by the Nonnast company as a factory and which had been owned by Nonnast personally. Just how an executor could have the real estate of the deceased in charge is not explained. A total purchase price of $65,000 was agreed to be paid by the purchasers, $40,000 being allocated to the inventory and $25,000 to the machinery and equipment. The purchasers paid no cash on this contract, the entire purchase price being represented by monthly instalments, which began at the rate of $208.33 per month. The purchasers were authorized by the contract to form a company to be known as the Nonnast Company and to convey thereto the assets so purchased. This contract was carried out and the monthly payments thereunder made for a period of approximately one year. By that time the new Nonnast Company had used up all the assets as contained in the inventory which had been purchased, and it then went into bankruptcy. Neither Louis F. Nonnast Sons, Inc. nor the executor ever recovered anything out of this bankruptcy.

During the Northern Trust Company's management of the Nonnast company, the Nonnast company paid in full all creditors including the Northern Trust Company excepting the claims of the estate of Louis F. Nonnast. On December 20, 1932, the Nonnast company, having slightly in excess of $1,600 on hand as its sole remaining asset, paid $1,600 to the estate of Louis F. Nonnast. No other payment has ever been received on account of the notes of the Nonnast company, and they are now totally worthless. The total amount paid out by the Nonnast company on account of debts of

the Nonnast company which were owing on March 6, 1930, and which were still owing on May 31, 1930, was $47,253.22.

In the course of its administration of the estate of Nonnast, incompetent, and of the estate of Nonnast, deceased, the Northern Trust Company has taken credit for fees for itself and its attorneys in the total amount of $21,500. Of this amount $11,000 was paid to attorneys, and $10,500 was retained by the Northern Trust Company for its services. The attorneys' fees were paid as follows: On August 2, 1930, $1,000 to Hyde, Westbrook, Watson & Stephenson, for services as attorneys for the conservator; on September 25, 1931, $6,500 to A. J. Hennings for services as attorney for the executor; on October 25, 1935, $3,500 to Vernon R. Loucks for services as attorney for the executor.

Upon the filing of its final account as conservator, without notice, the Northern Trust Company asked and was allowed a fee of $5,000. It took only $971.12 at that time, leaving the balance of $4,028.88 unpaid. On October 25, 1935, the executor paid to itself this balance of $4,028.88. The Northern Trust Company filed no claim for this amount against the estate of Nonnast, deceased, nor did it have any person appointed to represent the estate in connection therewith, as provided by statute.

The Northern Trust Company, as executor, filed its first current account, with notice only to itself as trustee under the will of Nonnast, on March 27, 1933, and on the same day the account was approved by the probate court. Its amended second and final account as executor was filed March 3, 1936.

When the last account was filed, objections were filed by the objectors, both to that account and to the first current account of the executor. At the same time a petition was filed by the objectors seeking to set aside the order approving the first and final account of the conservator and making certain objections.

The total amount which the objectors seek to charge the Northern Trust Company was the sum of approximately $119,817.35. It will be necessary to consider each item by itself.

The Northern Trust Company first as conservator and later as executor, took a total of $26,500 from the funds of the estates which it consecutively administered and loaned the same to Louis F. Nonnast Sons, Inc., on unsecured notes of that company. The Northern Trust Company in its accounting as conservator asks credit for $20,000 disbursed on account of these loans and in its accounting as executor asks credit for $6,500 thereof. The conservator's account indicates that $15,200 was loaned prior to the death of Louis F. Nonnast and after his death $4,800 was loaned.

As to the loans made by the Northern Trust Company as conservator, the Illinois Rev. Stat. 1937, ch. 86, sec. 18 [Jones Ill. Stats. Ann. 77.120], directs how such funds be invested, as follows:

"It shall be the duty of the conservator to place and keep his ward's money at interest, upon security to be approved by the court, by investing, on approval of the court, the same in United States bonds or in the bonds of . . . any state, county, city or municipality, . . . Personal security may be taken for loans not exceeding $100. Loans upon real estate shall be secured by first mortgage, or trust deed thereon and, . . . not to exceed one-half the value thereof. All loans shall be subject to the approval of the court."

*In re Estate of Lalla,* 281 Ill. App. 124, affirmed 362 Ill. 621, 626, wherein the Supreme Court in that case said: "The statutory requirements relating to investments by guardians and conservators are mandatory. . . . They specify the securities upon which funds of a ward may be loaned, and in that regard they supersede the common law." *Chapman v. American Surety Co.,* 261 Ill. 594; *In re Sargent's Estate,* 276 Ill. App. 312; *In re Estate of Lalla,* 362 Ill. 621; *McIntyre v. People,* 103 Ill. 142.

The Northern Trust Company in this case claims that as to $17,500 of the total $20,000 loaned by it as the conservator, the probate court authorized those loans and in doing so was properly exercising its jurisdiction. No statute or authority has been cited showing that the probate court is authorized to extend beyond the terms of the statute, the kind of investments that may be made by a conservator.

In the case of *Chapman v. American Surety Co.*, 261 Ill. 594, the court had before it the question of whether or not a guardian should be held liable for a loss on an investment which had been authorized by the probate court. The court thereafter held that the authorization of the probate court was void and that the guardian was liable. The statute is binding upon the probate court as it is upon the guardian or anyone else.

As to the $6,500 which was loaned to the Nonnast company by the executor in November, 1930, we find that neither the statute nor the will gave to the executor any power of investment. It has been held in this state that unless the will gives an executor authority to lend money of such estate, that he is without authority and any loans which he may make are at his peril. *In re Estate of Wesley*, 279 Ill. App. 349; *Caruthers v. Caruthers*, 99 Ill. App. 402; *In re Busby's Estate*, 288 Ill. App. 500.

In the *Wadsworth v. Connell* case, 104 Ill. 369, the court said: "The statute has not conferred on executors or administrators power to loan the funds of the estate, nor was there any such power conferred by this will. It then follows, that appellant made these loans without legal authority, and of his own wrong. . . . He loaned it at his peril. Nor had the county court any power whatever to render an illegal act valid and binding."

*Grace v. Seibert*, 235 Ill. 190, was a case somewhat in point to the instant case. The decedent in that case prior to his death had entered into an agreement with the plaintiff for a lease of certain store premises, in

which premises the decedent was at the time conducting a drug store. The decedent died before the leased term under the new agreement began. The defendant, a relative of the decedent, took possession of the premises and continued to conduct the drug store which the decedent had conducted. He claimed the right to continue in possession under the lease. Suit was brought by plaintiff for possession. It was held by the court that the defendant was an executor *de son tort* and that since as executor he would have no right to continue to conduct the business, his right as executor *de son tort* was even less. The court said: "An administrator or executor would not have been authorized to leave the stock of drugs in trade or business, or to carry on the drug store. Such an enterprise would have been beyond the scope of the functions of an executor. To engage in business with the assets of an estate is regarded as a breach of trust, so that the law will charge an executor who does so, with losses, and will not allow him to receive any profits."

In the case of *Field, Leiter & Co. v. Colton*, 7 Ill. App. 379, an executor undertook to carry on the decedent's mercantile business and, pursuant to an order of the county court duly entered he used the funds of the estate to purchase certain additional merchandise to fill out the line of goods on hand, in order to make it more saleable. There was no question raised as to the good faith of this transaction or the good business judgment of the executor in purchasing the additional stock. The business was, in fact, liquidated with reasonable dispatch and the estate recovered all the money it had invested in additional merchandise and no loss resulted from the transaction. The executor, however, in purchasing the additional goods had purchased most of it from himself, he being in the merchandise business, and he had charged the estate a slight profit on the goods so sold by him to it, the profit being no greater than would have been charged to another pur-

chaser. The court held that the executor had no authority to continue the business of the decedent and that the county court had no jurisdiction to grant him such authority and that any act or order of the county court purporting to do so was a nullity. *Chicago Title & Trust Co. v. Fine Arts Bldg.*, 288 Ill. 142; *Smith v. Preston*, 170 Ill. 179; *Peterman v. United States Rubber Co.*, 221 Ill. 581.

From these authorities it appears that if an executor has no right to venture assets of an estate in carrying on a trade or business of the decedent, then an executor certainly is without authority to use assets of an estate in carrying on a trade or business belonging, not to decedent, but simply to a corporation in which the decedent had been a stockholder.

The probate court has no more power to grant to an executor the right to make investments, unless so authorized by the will, than it has to direct the kind of investments which a conservator can make beyond those described in ch. 86, sec. 18, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 77.120]; *Wadsworth v. Connell*, 104 Ill. 369; *Field, Leiter & Co. v. Colton*, 7 Ill. App. 379.

The objections which were filed to this item of $26,500 loaned to Louis F. Nonnast Sons, Inc. by the Northern Trust Company as conservator and executor should have been sustained and the said sum accounted for by the Northern Trust Company. We think the objections made by the appellee to the report of the Northern Trust Company as to these loans should have been sustained and the same disallowed and charged to the Northern Trust Company.

Objection No. 2 to the report of the Northern Trust Company is for the item of $3,550 which represents sundry expenses for the Nonnast company and not for the estates of Louis F. Nonnast. On September 2, 1930, the Northern Trust Company paid Thulin & Co., $1,300, of which amount $975 was for an audit of the

Nonnast company and the balance was for the June salary of D. T. Hill, the manager of that company. An additional $1,625 was paid Thulin & Co. on September 9, 1930. As to three of these months this salary was paid in advance. On January 9, 1931, the executor paid $25 to the Yates American Machine Co. for appraising the machinery and equipment of the Nonnast company. This appraisal was made in conjunction with the sale of the assets of that company to Ryan, Doyle and Hayes, heretofore mentioned. On October 5, 1931, a personal property tax bill of the Nonnast company amounting to $600 was paid by the Northern Trust Company as executor. These disbursements were not for debts of Louis F. Nonnast, and we cannot see wherein the Northern Trust Company either as conservator or executor had any authority to pay them. *Wilcox v. Parker,* 23 Ill. App. 429, as to executors; *Downing v. Siddens,* 247 Ky. 311, as to the authority as executors *Edwards v. Lane,* 331 Ill. 442; *In re Graves' Estate,* 242 Ill. 212. Therefore, the objections as to the items comprising the $3,550, should be sustained and that amount should be charged back to the Northern Trust Company.

The next objection relates to the payment of $2,998.15, to the Commonwealth Edison Company, on account of the contractual obligation of Louis F. Nonnast Sons, Inc. The circumstances with relation to this payment, are as follows:

Prior to the appointment of the Northern Trust Company as conservator, the Nonnast company had contracted with the Commonwealth Edison Company for the installation of a certain electrical equipment. It is claimed on behalf of the executor that this equipment covered by the contract was necessary to the operation of the Nonnast factory and, had the payment not been made, the Commonwealth Edison Company would have reclaimed it. The force of this contention is not supported for the reason that no payments were

made from March 6, 1930, the date of the conservator's appointment, until December 31, 1930, at which time the plant had been shut down. The equipment was not reclaimed until many months thereafter. No claim was ever filed by the Commonwealth Edison Company against either the conservator's estate or in the executor's estate. This was an obligation of the Louis F. Nonnast Sons, Inc. and not of the decedent and the executor had no authority to expend money of its estate for such a corporate obligation. The executor made the following payments on that contract:

"Feb. 17, 1931..............................$  496.05
 Mar. 24, 1931..............................   996.05
 Apr. 29, 1931..............................   996.05
 Oct. 27, 1931..............................   500.00
                                          _____
                                           $2,988.15"

No contention is made that these items were in any sense the obligation of any one but the Louis F. Nonnast Sons, Inc. The contract does not bear the signature of the deceased, but was signed on behalf of the company by W. H. Theel as its secretary. Evidently the Commonwealth Edison Company did not regard the estate as liable in any way as it did not file a claim against the estate. The executor had no authority to make this payment as this was an obligation of the Nonnast company and not of Louis F. Nonnast, and the objections thereto should have been sustained. *Edwards v. Lane,* 331 Ill. 442; *In re Graves' Estate,* 242 Ill. 212. It might be noteworthy to mention here that through evident lapse of care on behalf of the Northern Trust Company, executor, $500 was paid on this equipment on October 27, 1931, which was more than a year after letters testamentary had been issued on October 8, 1930, no claim having ever been filed in the decedent's estate. Consequently, the executor had no right to make that payment.

Ch. 3, sec. 71, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 110.071], provides:

" . . . All claims and demands of whatever class not exhibited to the court within one year from the granting of letters as aforesaid shall be forever barred as to property and estate of the deceased which has been inventoried or accounted for by the executor or administrator"; This provision of the statute constitutes a complete defense which an executor is legally bound to assert to the payment of any claim which was not filed within the specified year. *Hallgren v. Utt,* 155 Ill. App. 640 (Abst.); *In re Estate of Duffield,* 258 Ill. App. 78. Neither the executor nor the probate court could waive or ignore this defense. *Hapke v. People,* 29 Ill. App. 546; *Austin v. City Bank of Milwaukee,* 288 Ill. App. 36; *Wingate v. Pool,* 25 Ill. 118. If an executor pays after the expiration of the year, a claim which has not been exhibited to the probate court within the year as required by statute, then he cannot obtain credit for such payment. *Yaple v. Mahy,* 241 Ill. App. 446. These payments should be surcharged to the Northern Trust Company.

The next objection is made to the payment of $10,539.89 to the Security Bank of Chicago by the Northern Trust Company in payment of three unpaid notes of Louis F. Nonnast Sons, Inc. which were held by said Security Bank on May 17, 1930, the date of Nonnast's death. One note was dated February 3, 1930, one dated February 19, 1930, and one dated February 28, 1930. The principal of these notes, together with interest, aggregated $10,539.89 which was paid out of the estate funds on July 15, 1930. No claim was filed by the Security Bank against the Nonnast estate with respect thereto. It is claimed that payment was made because Nonnast was personally liable therefor as a guarantor. The Northern Trust Company made this payment in its capacity as conservator and the objectors take the position that the

Northern Trust Company, as conservator, had no power to make such disbursement after the death of its ward, and that this fact alone makes the Northern Trust Company liable therefor. It appears to us, however, that inasmuch as the Northern Trust Company made this payment without any claim having been filed and approved, which is contrary to the provisions of the statute, the Northern Trust Company had the burden of making proof that Louis F. Nonnast, the deceased, was in fact obligated on the notes in question. *Millard v. Harris,* 119 Ill. 185; *Walker v. Diehl,* 79 Ill. 473; *Lynch v. Hickey,* 13 Ill. App. 139. It therefore follows that in making the disbursement in question the Northern Trust Company was, in fact, paying an obligation upon which Louis F. Nonnast was not liable. They relied upon a written guarantee which was not produced at the hearing.

The two witnesses who testified against the estate were Norman B. Collins, president of the Security Bank, and Robert E. Agee, an assistant secretary of the Northern Trust Company, executor herein. We here find by this procedure, the officers of the executor testifying against the estate in an effort to justify their payment of these notes, leaving no one to defend the estate regarding said claims. It is the duty of an executor to protect and defend an estate and not do as was done in this case aid creditors to secure payment of their claims. *In re Estate of Duffield,* 258 Ill. App. 78.

From a review of the evidence we do not think it proves the liability of the estate of Nonnast. The payment should not have been made and should be surcharged against the executor for such wrongful payment.

This brings us to a consideration of the attorney's fees. After the death of Louis F. Nonnast, the Northern Trust Company on August 2, 1930, paid $1,000 to Messrs, Hyde, Westbrook, Watson & Stephenson for

their services as attorneys for the conservator, these services having been rendered during the lifetime of the deceased. The proper procedure would have been to file a claim therefor against the decedent's estate. This was not done, but the Northern Trust Company paid the amount due in full. There is nothing in the record as to the amount of the services rendered, the time spent thereon or as to what would be considered the usual or customary fee that should be charged therefor. The amount of this claim in our opinion should be surcharged to the Northern Trust Company.

The conservator received a total of $5,000 for its services, $971.12 of which was paid by the Northern Trust Company as conservator after Nonnast's death, and $4,028.88 of which was paid by the executor on October 25, 1935. No formal claim was ever filed by the Northern Trust Company in the decedent's estate for such fees, nor was there any hearing in the probate court in connection with the payment thereof at which some ''discreet person'' as provided by statute was appointed and appeared to defend the estate against the claim of the said executor for the fee purportedly due it for its services as conservator. Sec. 73, ch. 3, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 110.073], provides as follows:

''When an executor or administrator has a demand against his testator or intestate's estate, he shall file his demand as other persons; and the court shall appoint some discreet person to appear and defend for the estate, and, upon the hearing, the court or jury shall allow such demand, or such part thereof as is legally established, or reject the same, as shall appear just. . . .''

For having failed to comply with the requirements of section 73 of chapter 3 of the statute, the Northern Trust Company cannot be allowed this claim and it should be surcharged against it. *Corrington v. Corrington*, 15 Ill. App. 393; *Elting v. First Nat. Bank of*

*Biggsville,* 173 Ill. 368; *Fragd v. Estate of Mary A. Fragd,* 175 Ill. App. 246.

· The Northern Trust Company insists, however, that it preserved its rights in this regard by asserting a lien, as conservator, on the assets which it delivered in that capacity to itself as executor, for the then unpaid balance of its fee. We find no provision in the law permitting a conservator at fault to have a lien for its fees upon the assets held in its trust. *Kerner v. Peterson,* 368 Ill. 59, 81. At any rate it is clear that the assertion of a lien is not equivalent to the filing of a claim for a debt which the lien is supposed to secure. *Moore v. Chandler,* 59 Ill. 466.

In addition to what has been said, we note that the item of $4,028.88, as the conservator's fees, for which no claim was filed, was paid more than one year after letters testamentary had been issued in the executor's estate. The statute prevents the payment of debts which are not filed in the estate out of the assets inventoried after letters testamentary have been issued, unless the claim has been filed within a year thereafter, but we do not think the legislature intended that the payment of costs and allowance of fees would be included in such limitation. Letters testamentary were issued on October 8, 1930, and the second instalment amounting to $4,028.88 was paid almost four years after the statute of limitation imposed by section 71 had run.

We are not inclined to place a narrow construction upon the requirements set forth in the statute of limitations relative to not allowing fees to an executor or administrator in the event such claim for fees is not filed within a year, the same as other creditors. In allowing the fees of an executor, trustee, administrator, etc., it is necessary for a court to know the financial condition of the estate, the nature of the work necessarily involved, the amount of time consumed in doing such work and the result thereof, in order that the

court may fix a reasonable fee. This, necessarily, must in most cases await the conclusion of such work and near the closing of the estate relative to filing claim and furnishing proof thereof with the appointment of someone to defend the estate. However, for noncompliance with the statute as to filing this claim and having the same proven and the estate protected in the manner provided by statute, the said claim is disallowed and surcharged to the Northern Trust Company.

It is next contended that the Northern Trust Company personally should be liable for the costs in this matter because of its mismanagement of the estate. We think much force should be given to this contention. Here is an estate which has been entirely dissipated because of the actions of the conservator and executor. Among other evidences of mismanagement the Northern Trust Company loaned $26,500 of the estate's funds either as conservator or executor to Louis F. Nonnast & Sons, Inc., and lost it. It paid $2,988.15 to the Commonwealth Edison Company, which claim it was not obliged to pay; it paid $10,539.89 to the Security Bank of Chicago, which represented the principal and interest on three notes of the Louis F. Nonnast Sons, Inc., upon which notes the deceased was not liable, and to other creditors was paid the sum of $3,550; and, also made payments to the Grand Rapids Furniture Company without said claims having been exhibited to the court.

We do not think the costs in this case should be charged against the estates but should be borne by the executor and conservator who, because of their neglectful actions have caused the loss to the estates.

Persons or corporations who accept positions as conservators, executors, trustees, etc., are thereby placed in a fiduciary relationship and should observe, or should be compelled to observe, the law which governs the high duty which they have agreed to perform.

As was said by Mr. Justice CARDOZO in *Meinhard v. Salmon*, 249 N. Y. 458, 164 N. E. 545, 546:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt v. Fischer*, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

It is the duty of courts charged with the administering of estates to see that such estates are protected by demanding a complete, faithful observance of such duties. Failure to perform such duties by the executor has resulted in the instant case in the assets in these estates being almost entirely exhausted.

For the reasons herein given the order appealed from is reversed and the cause is remanded with directions to sustain the objections of the objectors and surcharge the items in the executor's and conservator's report against the Northern Trust Company as indicated in this opinion.

*Order reversed and cause remanded with directions.*

HEBEL and BURKE, JJ., concur.